## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|   |   |
|---|---|
| ALLAN J. CAMAISA, as Seller's Representative for SHAREHOLDERS OF PARALLEL 6, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>PHARMACEUTICAL RESEARCH ASSOCIATES, INC., a Virginia corporation,<br><br>Defendant. | C.A. No. 21-<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATIONS OF THE SHERMAN AND CLAYTON ACTS

Plaintiff ALLAN J. CAMAISA ("Plaintiff" or "Mr. Camaisa"), in his capacity as Seller's Representative of security holders (collectively, the "Sellers") of PARALLEL 6, INC., a Delaware corporation ("Parallel 6"), brings this action under the antitrust laws against defendant PHARMACEUTICAL RESEARCH ASSOCIATES, INC., a Virginia corporation ("Defendant" or "PRA"). The Sellers consist of holders of common stock, warrants, stock options, and stock appreciation rights of Parallel 6. Mr. Camaisa alleges as follows:

### NATURE OF THE CASE

1. This case concerns the market for cloud-based, bring-your-own-device ("BYOD") clinical trial software solutions for contract research organizations ("CROs"). Defendant's acquisition of Parallel 6, and Defendant's subsequent anticompetitive conduct, amounted to input foreclosure within that market.

2. Plaintiff, as the representative for the Sellers, seeks to recoup the Sellers' losses incurred under the acquisition, which were directly caused by and were "inextricably

intertwined" with Defendant's anticompetitive conduct and willful infliction of harm to its competitors within that market.

3. Plaintiff seeks treble damages, costs, and reasonable attorneys' fees for the acquisition of Parallel 6 by Defendant in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and for attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## THE PARTIES

4. Plaintiff is an individual residing in San Diego County, California.  Plaintiff became the Chief Executive Officer of Parallel 6 in or around 2014 and was also a shareholder of Parallel 6. Plaintiff files this action with the authority of and in the interest of the holders of common stock, warrants, stock options, and stock appreciation rights of Parallel 6. In 2019, Plaintiff was appointed Seller's Representative, replacing Parallel 6 founder David Turner ("Mr. Turner").

5. Defendant is a publicly-traded corporation organized, existing and doing business under and by the virtue of the laws of the State of Virginia, with its headquarters at 4130 Park Lake Avenue, Suite 400, Raleigh, NC 27612. Defendant is one of the world's largest CROs, with over 16,000 employees, over seventy-five global offices, a presence in more than eighty countries, and revenue in 2018 of around $2.87 billion.  Defendant acquired Parallel 6 in May 2017.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction and jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1337 and over the federal antitrust claims asserted herein under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

7. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, in that this case involves the acquisition of the ownership of Parallel 6, a Delaware corporation.

## TRADE AND COMMERCE

8. Defendant and Parallel 6 were and are engaged in "commerce," as that term is defined in Section 1 of the Clayton Act, 15 U.S.C. § 12(a). The sale of Parallel 6's software as a service ("SaaS") products was and is a distinct "line of commerce" within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendant's transactions and conduct have and will have a substantial, direct, and reasonably foreseeable effect on interstate commerce. Parallel 6's SaaS products were sold across state lines.

## THE RELEVANT MARKET

9. The relevant line of commerce and product market in which to analyze the effects of Defendant's acquisition of Parallel 6 and Defendant's subsequent anticompetitive conduct is the market for cloud-based, bring-your-own-device ("BYOD") clinical trial software solutions for CROs.

10. The relevant geographic market for analyzing the effects of Defendant's acquisition of Parallel 6 and Defendant's subsequent anticompetitive conduct is the United States.

**FACTS**

11.     Parallel 6 was formed in or around October 29, 2009 and was one of the first SaaS companies to offer clinical research and health-related software solutions to CROs.

12.     Parallel 6's platform consisted of two SaaS solutions for CROs: Site Startup and Clinical6. Together, Site Startup and Clinical6 offered an end-to-end mobile clinical trial software solution. As a cloud-based, BYOD platform, Parallel 6's software enabled CROs to conduct decentralized clinical trials.

13.     In 2016 and 2017, Parallel 6 had limited competition in the cloud-based clinical trial software market, specifically with regard to its patient engagement solution, Clinical6. One of PRA's competitors, ERT, offered the most similar solution. Although ERT's solution was similar to Parallel 6's technology, it relied on devices specifically designed to run its software. Parallel 6's technology allowed cloud-based access from users' own devices (*i.e.*, "BYOD").

14.     A CRO that acquired Parallel 6's technology would have a clear competitive advantage over other CROs. At that time, no company other than Parallel 6 could offer CROs a cloud-based BYOD clinical trial software solution. A CRO leveraging Parallel 6's technology would be positioned to steal market share from its CRO competitors, who would have no access to comparable products. Several CROs recognized this advantage and submitted offers to acquire Parallel 6 around this time.

15.     In or around December 2016, Defendant expressed an interest in the acquisition of Parallel 6. Defendant and Parallel 6 (together, the "Companies") began merger discussions at that time. Other CROs made offers to purchase Parallel 6 around that time, but Defendant emerged with the leading offer. The Companies entered into a non-binding letter of intent for

Defendant's acquisition of Parallel 6 by means of a cashout merger with Defendant's wholly-owned subsidiary, Jaguar Merger Sub.

16. During the negotiations, Defendant proposed a purchase price structure as follows: (a) $40 million payable upfront; plus (b) up to an additional $10 million (the "Contingent Consideration") if Parallel 6 was able to achieve a milestone of $34 million in revenue over an 18-month period (the "Contingent Consideration Event"). If Parallel 6 did not achieve the Contingent Consideration Event, it would be entitled to receive a pro-rata lesser amount so long as it achieved at least 70% of that milestone.

17. Parallel 6 reasonably believed it could easily achieve the proposed Contingent Consideration Event. It already had a significant pipeline of business with other CROs, which were Defendant's competitors. At the time, Parallel 6's business was also growing rapidly.

18. The Agreement and Plan of Merger dated May 10, 2017 (the "Merger Agreement") included a total purchase price of $40 million, plus the Contingent Consideration of up to $10 million (subject to the 18-month period and pro-rata conditions, laid out in ¶ 16 above). The merger transaction (the "Merger") closed in or around May 2017.

19. Defendant requested that Parallel 6 appoint a Seller's Representative to, among other things, act on behalf of all of the Sellers, negotiate disputes under the Merger Agreement or any ancillary agreements, give or receive notices, and to bring or defend any claim or action on behalf of the Sellers. Defendant insisted that Mr. Turner serve as the Seller's Representative, and the parties ultimately agreed to such role in the Merger Agreement. Mr. Turner would also continue working for Parallel 6 after the Merger as its President.

20. PRA's conduct after the Merger demonstrated PRA's clear intent to engage in anticompetitive conduct and cause harm to its competitors. It is evident from PRA's conduct that

PRA acquired Parallel 6 with the sole purpose to withhold Parallel 6's products from PRA's competitors. This would also prevent Parallel 6 from ever being able to achieve the Contingent Consideration Event.

21. Following the Merger, Defendant refused to engage in new sales of Parallel 6's products to its competitors. In July 2017, Mr. Turner was directed to fire Parallel 6's entire outside sales team because Parallel 6 products would no longer be sold to PRA's competitors.

22. Plaintiff was informed that a former PRA sales representative was instructed not to sell to a large CRO. The executive of that CRO expressed to the former sales representative that he was amazed that PRA would forego "$30 million in revenues" by not selling the software developed by Parallel 6 to his company.

23. In or around November-December 2017, PRA ceased selling Parallel 6's Site Startup platform. Then, in early 2018, PRA initiated a freeze of all Parallel 6 sales cycles.

24. PRA stated in its annual Form 10K for the year ended December 31, 2017, that "[d]uring the fourth quarter of 2017, [PRA] determined that the external software targets likely would not be met; therefore [PRA] released the $8.4 million contingent consideration liability, which is recorded within transaction-related costs in the consolidation statements of operations." The $8.4 million contingent consideration liability referenced in that statement refers to the $10 million Contingent Consideration payable to the Sellers, based on the "fair value" as of the closing date using a "Monte Carlo" simulation. As the Merger was finalized in May 2017, the 10K demonstrates that PRA had already decided sometime in the fourth quarter of that year (*i.e.*, only 5-6 months after execution of the Merger Agreement) that Parallel 6 was going to fail to achieve the Contingent Consideration milestone, despite there being over a full year left to achieve it.

25. Prior to the above-mentioned post-merger actions taken by PRA, PRA assured Parallel 6 that it would be permitted to continue selling its products to third parties, including PRA's competitors.

26. In or around August 2018, Mr. Turner was terminated from his employment with PRA when, in his capacity as Seller's Representative, Mr. Turner relayed written concerns from Plaintiff about PRA's actions that prevented Parallel 6 from earning its Contingent Consideration.

27. Defendant's harm to the Sellers continued through the end of the 18-Month Contingent Consideration period in or around November 2018. PRA, as it had always intended, paid no Contingent Consideration to Parallel 6 when it became due.

28. In 2019, Mr. Turner resigned as the Seller's Representative. Plaintiff was duly appointed as the Seller's Representative, with the authority to act on behalf of and in the interest of the shareholders of Parallel 6, pursuant to the terms of the Merger Agreement.

29. In or around February 24, 2021, PRA's acquisition by ICON plc ("ICON"), another competitor CRO, was announced. In the press release for the acquisition, ICON touted PRA's "mobile and connected health platforms and real-world data and information solutions." PRA acquired these assets from Parallel 6.

30. ICON's acknowledgment that Parallel 6 products make PRA an attractive acquisition target demonstrates that Parallel 6's products were, (a), valuable to PRA such that PRA did not cease selling Parallel 6 products, as described above, for defectiveness or other related issues; and, (b), attractive enough to PRA's competitor CROs that a competitor CRO would (at least in part) acquire PRA for access to Parallel 6 products.

31. PRA has failed to pay any of the Contingent Consideration to the Sellers or provide any reasonable explanation for such failure or its conduct in preventing the achievement of the Contingent Consideration Event.

32. Defendant's post-Merger conduct demonstrates that PRA entered into the Merger Agreement to completely foreclose its competitors' access to Parallel 6's products, causing them injury, while having no intention of ever paying Sellers any part of the Contingent Consideration.

33. Defendant's conduct after the Merger resulted in input foreclosure by removing Parallel 6's products from the relevant market and therefore lessening and harming competition within that market.

34. Defendant's nonpayment of the Contingent Consideration when it became due was the culmination of Defendant's injury to the Sellers, on whose behalf Plaintiff now files this action.

35. Defendant, in effectuating the Merger, and in its conduct after the Merger, therefore violated Section 7 of the Clayton Act and Section 2 of the Sherman Act, for which violations Plaintiff seeks treble damages, attorneys' fees, and the costs of this action on behalf of the Sellers.

## ANTICOMPETITIVE EFFECTS

36. As a result of the Merger, Defendant's competitor CROs have been deprived of access to Parallel 6's products. Prior to Defendant's acquisition of Parallel 6, Parallel 6 marketed and sold its SaaS solutions to several different CROs and other third parties. At the time of PRA's acquisition of Parallel 6, Parallel 6 was the only company selling a ready-to-go, cloud-based clinical trial solution. A number of Defendant's competitor CROs offered to buy Parallel 6 in or around the same time as Defendant.

37. In the time period following Defendant's acquisition of Parallel 6, PRA's input foreclosure within the relevant market has had a significant lasting effect within that market. Emerging companies offering similar clinical trial platforms have been swiftly acquired by CROs that compete with PRA.

38. Now, with limited availability of comparable products, and spiked growth in decentralized clinical trials due to COVID-19, CROs are now acquiring other CROs for access to clinical trial software that, like Parallel 6's platform, enables decentralized clinical trials (as evidenced by ICON's acquisition of PRA).

## ANTITRUST INJURY

39. As a direct, proximate, and foreseeable result of the Merger and Defendant's subsequent conduct, the Sellers (as represented by Plaintiff) have been injured in their business and property.

40. Defendant acquired Parallel 6 with the intention to discontinue the marketing and sale of Parallel 6 products to Defendant's competitor CROs.

41. Defendant's acquisition of Parallel 6 and Defendant's conduct after the Merger were aimed at foreclosing competitor CROs' access to Parallel 6 products, thereby harming Defendant's competitors.

42. Defendant's refusal to market and sell Parallel 6 products to competitor CROs directly harmed the Sellers by foreclosing on the ability of Parallel 6 to earn its $10 million Contingent Consideration.

43. Injury to the Sellers (the loss of the $10 million Contingent Consideration) is inextricably intertwined with the harm that Defendant sought to inflict on its competitors by creating input foreclosure within the relevant market.

44. As a direct, proximate, and foreseeable result of the Merger and Defendant's subsequent conduct, competition in the relevant market has been harmed and reduced by the removal of Parallel 6's products.

45. As a direct, proximate, and foreseeable result of the Merger and Defendant's subsequent conduct, competition in the relevant market has been harmed and reduced. Defendant's competitors, feeling pressured to aggressively defend their access to the new products that have emerged in Parallel 6's absence, have swiftly moved to acquire the companies producing these new products. Furthermore, as ICON's acquisition of PRA demonstrates, CROs have begun merging to further consolidate access to these software solutions.

## VIOLATIONS ALLEGED

46. Plaintiff incorporates the allegations of paragraphs 1 through 45 above as if fully set forth in each Count herein.

## COUNT I
### (Merger in Violation of the Clayton Act § 7)

47. Plaintiff brings Count I of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, for damages directly and proximately caused to the Sellers by the Merger and Defendant's subsequent conduct in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The Merger and Defendant's subsequent conduct has lessened competition in interstate trade and commerce in the relevant market throughout the country, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## COUNT II
### (Attempted Monopolization in Violation of the Sherman Act § 2)

48. Plaintiff brings Count II of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, for damages against defendants for violating section 2 of the Sherman Act, 15

U.S.C. § 2. The Merger and Defendant's subsequent conduct resulted in Defendant's attempted monopolization of the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as described herein.

49. As a direct and proximate result of the foregoing, the Sellers (as represented by Plaintiff) have lost their business and property.

## DEMAND FOR JURY TRIAL

50. Plaintiffs demand trial by jury of all issues so triable.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

## **RELIEF REQUESTED**

A. Three-fold damages directly and proximately caused by defendants' anticompetitive conduct and attempted monopolization of the relevant market;

B. An order awarding a reasonable attorneys' fee and the costs of this suit;

C. Pre-and post-judgment interest; and

D. Such other and further relief as may be just and necessary.

Dated: May 28, 2021  
       Wilmington, Delaware

Respectfully Submitted,

**KLEIN LLC**

*/s/ Julia Klein*
Julia B. Klein (#5198)
225 West 14th Street, Suite 100
Wilmington, DE 19801
klein@kleinllc.com
(302) 438-0456

and

**DE CASTRO, P.C.**
Audie J. de Castro (#197217)
701 B Street, Suite 1745
San Diego, CA 92101
(619) 702-8690

and

**JOHN R. MAYER, APLC**
John R. Mayer (#197765)
3033 Fifth Avenue, Suite 227
San Diego, CA 92103
(619) 255-1357

*Counsel for Plaintiff*