## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ALLAN J. CAMAISA, as Seller's Representative for SHAREHOLDERS OF PARALLEL 6, INC., a Delaware corporation, | ) ) ) ) ) | Civil Action No.  21-cv-00775-EJW |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PHARMACEUTICAL RESEARCH ASSOCIATES, INC., a Virginia corporation, | ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Julia B. Klein, KLEIN LLC, Wilmington, DE; Audie J. de Castro, DE CASTRO, P.C., San Diego, CA; John R. Mayer, JOHN R. MAYER, APCL, San Diego, CA – Attorneys for Plaintiffs

Stephen B. Brauerman, Sarah T. Andrade, BAYARD, P.A., Wilmington, DE; F.M. Haston III, Michael S. Denniston, Kimberly B. Martin, Samuel T. Acker, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL – Attorneys for Defendant

March 22, 2022
Wilmington, Delaware

**WALLACH, U.S. CIRCUIT JUDGE:**

Plaintiff Allan J. Camaisa ("Mr. Camaisa"), as the Seller's Representative for security holders (collectively, the "Shareholders") of Parallel 6, Inc. ("Parallel 6"), brought this action against Defendant Pharmaceutical Research Associates, Inc. ("PRA"), asserting two counts. Complaint (D.I. 1).  Both counts are antitrust claims.  *Id.*  PRA filed a Motion to Dismiss, asserting that Mr. Camaisa has failed to support the claims with sufficient factual allegations.  Motion to Dismiss (D.I. 6).  For the reasons discussed below, the Motion to Dismiss is granted.

I.     <u>BACKGROUND</u>

    **A.  The Parties**

In 2014, Mr. Camaisa became a shareholder and the Chief Executive Officer of Parallel 6. Complaint ¶ 4.  Mr. Camaisa was appointed Seller's Representative, replacing Parallel 6 founder David Turner.  *Id.* ¶ 4.  Parallel 6 was founded in 2009 and was a software as a service ("SaaS") company, targeting clinical research and health-related software solutions.  *Id.* ¶ 11.  Parallel 6 created two SaaS solutions for contract research organizations ("CROs"):  Site Startup and Clinical6.  *Id.* ¶ 12.  In 2016, Parallel 6 had limited competition in the market for Clinical6.  *Id.* ¶ 13.  Parallel 6's technology allowed cloud-based access to software from the users' own devices (*i.e.*, "BYOD"), which no other company could offer at the time.  *Id.* ¶¶ 13–14.  Mr. Camaisa states in the Complaint that "[a] CRO that acquired Parallel 6's technology would have a clear competitive advantage over other CROs . . . [and] would be positioned to steal the market share from its CRO competitors, who would have no access to comparable products."  *Id.* ¶ 14.

Defendant PRA is one of the world's largest CROs, with over seventy-five global offices and a revenue of around $2.87 billion in 2018.  *Id.* ¶ 5.  PRA expressed interest in acquiring Parallel 6 in late 2016.  *Id.* ¶ 15.  PRA proposed a purchase price structure comprising of $40 million payable

upfront with up to an additional $10 million ("Contingent Consideration") if Parallel 6 reached a $34 million revenue milestone over an 18-month period ("Contingent Consideration Event"). *Id.* ¶¶ 15–16. Parallel 6 would be entitled to receive a pro-rata lesser amount if it reached at least 70% of that milestone but not the full Contingent Consideration Event. *Id.* ¶ 16. Parallel 6 "reasonably believed it could easily achieve the proposed Contingent Consideration Event," and the parties closed the merger transaction in May 2017. *Id.* ¶¶ 17–18. Following the closing of the merger, PRA refused to engage in new sales of Parallel 6's products to competitors, and instructed Mr. Turner, acting as Seller's Representative and President of Parallel 6, to fire Parallel 6's outside sales team in July 2017, "because Parallel 6 products would no longer be sold to PRA's competitors." *Id.* ¶ 21. At the end of 2017, "PRA ceased selling Parallel 6's Site Startup platform," and in 2018, froze "all Parallel 6 sales cycles." *Id.* ¶ 23.

In its annual Form 10K for the 2017 year, PRA stated that "the external software targets likely would not be met; therefore, [PRA] released the $8.4 million contingent consideration liability, which is recorded within transaction-related costs" in the merger agreement with Parallel 6. *Id.* ¶ 24 (internal quotation marks omitted). The $8.4 million cost referred to the Contingent Consideration amount. *Id.* Mr. Camaisa concluded that this is evidence that "PRA had already decided sometime in the fourth quarter of [2017] . . . that Parallel 6 was going to fail to achieve the Contingent Consideration milestone, despite there being over a full year left to achieve it." *Id.* At the end of the 18-month Contingent Consideration period, PRA paid no Contingent Consideration to Parallel 6 when it became due. *Id.* ¶ 27. Mr. Camaisa states that "it is evident from PRA's conduct that PRA acquired Parallel 6 with the sole purpose to withhold Parallel 6's products from PRA's competitors . . . [and to] prevent Parallel 6 from ever being able to achieve the Contingent Consideration Event." *Id.* ¶ 20. In all, Mr. Camaisa asserts that "PRA's conduct after the Merger demonstrated PRA's clear intent to engage in anticompetitive conduct and harm its competitors" and

thus, "[a]s a direct, proximate, and foreseeable result of the Merger and Defendant's subsequent conduct, the [Shareholders] (as represented by Plaintiff) have been injured in their business and property." *Id.* ¶¶ 20, 39.

### B. Procedural History

In May 2021, Mr. Camaisa filed a "Complaint for Violations of the Sherman and Clayton Acts" against PRA. *See generally* Complaint. The Complaint alleged two causes of action. *Id.* ¶¶ 47–49. The first count is for a merger in violation of § 7 of the Clayton Act. *Id.* ¶ 47. The second count is for attempted monopolization in violation of § 2 of the Sherman Act. *Id.* ¶¶ 48–49. Mr. Camaisa is seeking treble damages for the injury directly and proximately caused by PRA's anticompetitive conduct and attempted monopolization of the relevant market.[1] *Id.*

PRA asserts three arguments as to why the court should dismiss this case. *See generally* Motion to Dismiss (D.I. 7). First, it argues that Mr. Camaisa has failed to satisfy the standards of pleading. *Id.* at 5–6. Specifically, it asserts that Mr. Camaisa has relied on statements of legal conclusions instead of factual allegations to support his claims. *Id.* Second, it argues that Mr. Camaisa lacks antitrust standing as he has not suffered an "antitrust injury" and is unable to satisfy the other antitrust standing factors. *Id.* at 6–14. Third, PRA asserts that Mr. Camaisa has not pled the required elements for either the Clayton Act § 7 or Sherman Act § 2 claims. *Id.* at 14–20. These include failure to plead a relevant market, anticompetitive effect on the relevant market, intent to monopolize the relevant market, and dangerous probability of achieving monopoly power. *Id.* Additionally, PRA noted in its Motion to Dismiss that Mr. Camaisa has initiated a proceeding in the

---

[1]   It is unclear what damage amount Mr. Camaisa is requesting for injury directly and proximately caused by PRA's actions. The only reference to injury in the Complaint is the loss of the $10 million Contingent Consideration, and therefore, the court treats this as the injury amount, for purposes of this Motion. Complaint ¶ 43.

Delaware Chancery Court "which involves the same parties, the same counsel, substantively parallel allegations, and, most tellingly, identical claimed damages." *Id.* at 1.

## II.    LEGAL STANDARD

### A.   Motion to Dismiss

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555–56.

When determining whether dismissal is appropriate, the court must take three steps. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must identify the elements of the claim. *Iqbal*, 556 U.S. at 675. Second, the court must identify and reject conclusory allegations. *Id.* at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Twombly*, 550 U.S. at 555 ("courts are not bound to accept as true a legal conclusion couched as a factual allegation") (internal quotation marks and citation omitted). Third, the court should assume the veracity of the well-pleaded factual allegations identified under the first prong of the analysis, and determine whether they are sufficiently alleged to

state a claim for relief. *Iqbal*, 556 U.S. at 678; *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The third prong presents a context-specific inquiry that "draw[s] on [the court's] experience and common sense." *Iqbal*, 556 U.S. at 663–64. As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## III.   **DISCUSSION**

PRA asserts that Mr. "Camaisa's allegations do not satisfy the *Twombly* and *Iqbal* standards requiring facial plausibility of factual allegations." Motion to Dismiss at 5. Specifically, PRA argues that Mr. Camaisa "has failed to support his claims with sufficient factual allegations directed to the required elements of (1) antitrust standing; (2) a relevant market; and (3) market share, market power, or any alleged effect of alleged market power." *Id.* Therefore, PRA contends that Mr. Camaisa has failed to adequately plead his claims, and his Complaint should be dismissed. *Id.* Mr. Camaisa argues that he has adequately plead each of the required elements and that his Complaint should not be dismissed. Opposition to Motion to Dismiss 4–21 (D.I. 9). The court agrees with PRA.

### A.   **Mr. Camaisa Has Failed to Allege an Antitrust Injury Necessary to Establish Standing and the Remaining Antitrust Factors Do Not Weigh in His Favor**

The Clayton Act § 4 permits one "injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States" for treble damages. 15 U.S.C. § 15(a). "For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of 'antitrust standing.'" *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013) (quoting *City of Pittsburgh v. W. Pa. Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998)). Antitrust standing acts as a mechanism to identify plaintiffs that have genuinely and directly been harmed by anticompetitive measures as "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover

threefold damages for the injury to his business or property." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982).

The Third Circuit has identified five factors that govern antitrust standing: "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 269 (3d Cir. 2018) (citing *Ethypharm*, 707 F.3d at 232–33).

### 1. Mr. Camaisa Has Failed to Adequately Plead that He Has Suffered an Antitrust Injury

PRA contends that Mr. Camaisa lacks standing because he has not suffered an antitrust injury. Motion to Dismiss at 5. Specifically, PRA argues that Mr. Camaisa could not have suffered an antitrust injury because he "is neither a consumer nor a competitor in the relevant market." *Id.* at 7. Further, PRA argues that Mr. Camaisa's allegation that PRA "violated the antitrust statutes by acquiring Parallel 6 and then unilaterally refusing to sell Parallel 6 products to PRA's competitors," "is not logically linked to [Mr.] Camaisa's alleged harm, much less 'inextricably intertwined.'" *Id.* at 8–9. In opposition, Mr. Camaisa argues that "the Complaint demonstrates that Parallel 6's injury was the very mechanism used by PRA to harm competition." Opposition to Motion to Dismiss at 5. Accordingly, Mr. Camaisa asserts that he has suffered an antitrust injury. *Id.* at 5–8. The court agrees with PRA.

The second factor, antitrust injury, is a necessary condition of antitrust standing, and if it is lacking, the court need not address the other factors. *See Ethypharm*, 707 F.3d at 233. To show

antitrust injury, the plaintiff must "prove more than injury causally linked to an illegal presence in the market[,]" instead it must show "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' act unlawful . . . [and] reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The plaintiff must be "a competitor or a consumer in the market allegedly restrained" to suffer an antitrust injury. *Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997). A limited exception is found when "there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy." *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (internal citations omitted).

Here, Mr. Camaisa has failed to adequately plead that he has suffered an antitrust injury. Mr. Camaisa is neither a consumer nor a competitor in the relevant market. *See Barton & Pittinos*, 118 F.3d at 181 ("A plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury."). Instead, Mr. Camaisa alleges that his damages are "inextricably intertwined" with PRA's alleged antitrust violation. *See* Complaint ¶¶ 2, 43. Specifically, Mr. Camaisa alleges that his injury of not receiving the $10 million Contingent Consideration is "inextricably intertwined" with PRA's misconduct of acquiring Parallel 6, and then unilaterally refusing to sell Parallel 6 products to PRA's competitors. *Id.* ¶¶ 41–42. However, the "inextricably intertwined" exception that Mr. Camaisa alleges is meritless because the alleged antitrust violation is not logically linked to Mr. Camaisa's alleged harm. Mr. Camaisa's alleged injury flows not from an alleged antitrust violation, but rather, it flows from an alleged breach of contract. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999) ("The simple invocation of [the phrase 'inextricably intertwined'], however, will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered an injury of the

type—almost exclusively suffered by consumers or competitors—that the antitrust laws were intended to prevent.").

Moreover, the Third Circuit has explained that the typical harm giving rise to antitrust injury includes paying higher prices for products or being forced out of the market by defendant's alleged conduct. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (finding antitrust injuries where plaintiffs paid higher prices for products as a result of a price-fixing conspiracy); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289 (3d Cir. 2012) (finding antitrust injuries where defendant's "exclusive dealing agreements" forced competitors from the market). Here, Mr. Camaisa makes no such allegations of paying higher prices for products or being forced out of the market by PRA's alleged conduct. *See generally* Complaint. Because Mr. Camaisa has failed to adequately plead an antitrust injury, consequently, Mr. Camaisa lacks standing to assert antitrust claims under § 7 of the Clayton Act.

### 2. None of the Remaining Antitrust Standing Factors Weigh in Favor of Mr. Camaisa

PRA contends that "[t]he balance of the 'antitrust standing' factors does not confer antitrust standing on Mr. Camaisa." Motion to Dismiss at 12. Specifically, PRA argues that "[h]ere, the causal connection between the antitrust violation and the intent by the defendant to cause that harm is too attenuated to confer antitrust standing." *Id.* at 13 (quotation marks omitted). Moreover, PRA argues that the existence of more direct victims "poses a risk of duplicative recovery against PRA," which weighs against finding antitrust standing for Mr. Camaisa. *Id.* at 13–14. Mr. Camaisa contends that the factors weigh in his favor. Opposition to Motion to Dismiss at 12. Specifically, Mr. Camaisa argues that "[b]ecause the Shareholders were directly harmed by PRA's anticompetitive conduct, in an analogous 'inextricably intertwined' manner to the plaintiffs in *McCready* and *Hanover*, the existence of other direct victims does not undermine their antitrust standing." *Id.* at 14–15.

Additionally, Mr. Camaisa argues that "the potential for duplicative recovery is not currently probable," and therefore weighs in his favor. *Id.* The court agrees with PRA.

Even if Mr. Camaisa adequately pled antitrust injury, antitrust injury alone is insufficient to establish antitrust standing, as "the remaining . . . factors may weigh against allowing him or her to sue under the antitrust laws." *Barton & Pittinos*, 118 F.3d at 182 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)). Accordingly, the court must determine whether the remaining factors weigh in favor of satisfying antitrust standing. *See Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) (setting forth the factors to consider for antitrust standing, specifically focusing on the nature of the plaintiff's injury to ensure that only those actually injured by anticompetitive activity are able to recover treble damages).

None of the remaining antitrust standing factors weigh in favor of Mr. Camaisa. The first factor, concerning causal relationship between the alleged antitrust violation and the harm to Mr. Camaisa, weighs in favor of PRA. As explained above, the court finds meritless Mr. Camaisa's argument that the Shareholders' injury is inextricably intertwined to PRA's allegedly anticompetitive conduct. Specifically, the Complaint alleges that PRA violated antitrust law by reducing competition in the market to monopolize it. Complaint ¶¶ 44–45. However, Parallel 6's harm of not meeting the Contingent Consideration Event does not stem from any reduction in competition or monopoly activity like price fixing, which falls into the purview of antitrust law. *See Processed Egg Prods.*, 881 F.3d at 273–74. Instead, the harm results from PRA's acquisition of Parallel 6 and subsequent post-merger actions that prevented it from marketing its platforms. Complaint ¶ 45. As these injuries are tenuously related to alleged antitrust actions and were not factually alleged to be an intended result of such actions, the first factor weighs in favor of PRA.

The third factor involves the directness of the injury to the anticompetitive effects. *See McCready*, 457 U.S. at 479. Mr. Camaisa argues that the Shareholders, like the plaintiffs in

*McCready*, are directly harmed.  Opposition to Motion to Dismiss at 8–9.  Mr. Camaisa's argument is meritless.  In *McCready*, the plaintiffs were forced to pay elevated prices for certain types of healthcare because of the coverage rates enacted by Blue Shield of Virginia for different types of health services.  457 U.S. at 483.  The actions of Blue Shield directly affected the plaintiffs' costs, even though they were not customers of Blue Shield.  *Id.*  Here, the Shareholders of Parallel 6 were not similarly affected by anticompetitive efforts by PRA because their status would have been the same even if PRA did not engage in their alleged anticompetitive actions.  Indeed, there was no guarantee that Parallel 6 would have reached its Contingent Consideration Event, and Parallel 6 benefited from PRA's acquisition since it did receive $40 million upfront.  Complaint ¶¶ 16, 18.  The injuries that Mr. Camaisa alleges are at most a breach of contract claim, and thus, are not a result of anticompetitive effects on the market, such as increased prices.  Instead, they are a result of Parallel 6 not reaching the sales goal for the Contingent Consideration.  Therefore, the third factor weighs in favor of PRA.

The fourth factor concerns whether there are more direct victims of the alleged antitrust violations.  Here, competing CROs which may be unable to sell products like those of Parallel 6, and the consumers of such products, are parties that would be more directly affected by PRA's antitrust actions.  Complaint ¶¶ 14–15, 36–38.  These parties could be directly affected if PRA was able to monopolize the market or reduce the competition, as they might be subject to increased prices and limited product options to buy or sell.  *See 2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 741–42 (3d Cir. 2004) (finding foreclosed market participants as a more direct victim than victims of a contractual breach).  Therefore, this factor weighs in favor of PRA.

The fifth factor is the potential for duplicative recovery.  Here, there are two possible avenues for duplicative recovery.  First, a more direct victim of PRA's alleged antitrust violations could sue for violation of § 2 of the Clayton Act or § 7 of the Sherman Act and recover treble damages for their

increased costs or lost profits.  *See McCullough v. Zimmer, Inc.*, No. 08CV1123, 2009 WL 775402, at *9 (W.D. Pa. Mar. 18, 2009) ("more direct victims means an increased possibility of duplicative recovery."), *aff'd*, 382 F. App'x 225 (3d Cir. 2010).[2]  Second and more importantly, Mr. Camaisa could bring a suit for breach of contract to recover the same damages, namely the Contingent Consideration, which indeed he has done in state court.  For these reasons, the final factor also weighs in favor of PRA.  *See 2660 Woodley Road*, 369 F.3d at 743 n.17 (explaining that the possibility of cumulative damages was "exceedingly probable if not inevitable," where plaintiff asserted claims for breach of contract).  Therefore, even if Mr. Camaisa had properly alleged an antitrust injury, the court finds that each of the remaining factors do not weigh in the favor of finding that Mr. Camaisa has established antitrust standing.

**B.   Mr. Camaisa has Failed to State a Claim Under § 7 of the Clayton Act or § 2 of the Sherman Act Because He Has Not Sufficiently Pleaded a Relevant Market, Anticompetitive Effect, or Attempted Monopolization**

Section 7 of the Clayton Act bars mergers where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  To establish a prima facie case, a plaintiff must "(1) propose the proper relevant market, and (2) show that the effect of the merger in that market is likely to be anticompetitive."  *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337–38 (3d Cir. 2016).

**1.   Mr. Camaisa has Failed to Plead Allegations that Plausibly Construct a Relevant Market**

PRA contends that Mr. Camaisa has failed to state a claim under § 7 of the Clayton Act or § 2

---

[2]   Mr. Camaisa could argue that the damages sought by "more direct victims" are of a different nature than those sought by the Shareholders and would not include any damages that would encompass the Contingent Consideration.  However, this argument is meritless because Mr. Camaisa has failed to allege that PRA's antitrust actions are responsible for the Shareholders' harm. *See Chemi SpA v. GlaxoSmithKline*, 356 F. Supp. 2d 495, 502–03 (E.D. Pa. 2005) (holding that duplicative recovery was unlikely because Chemi had a unique injury of lost profits which other victims could not assert, as they could only claim increased prices).

of the Sherman Act because he has not sufficiently pleaded a relevant market.  Motion to Dismiss at 14.  Specifically, PRA argues that Mr. Camaisa has only made a conclusory allegation about the relevant market with no explanation, and thus, he has failed to define a legally sufficient relevant market.  *Id.* at 14–16.  Mr. Camaisa contends that he has sufficiently pled a relevant market.  Opposition to Motion to Dismiss at 16.  Specifically, Mr. Camaisa argues that the relevant market he alleges is "derived from PRA executives' description of Parallel 6's products in their internal communications."  *Id.* at 17.  The court agrees with PRA.

Any merger that substantially lessens competition in economically significant submarket is proscribed by § 7 of the Clayton Act.  To make a prima facie case of illegality, the plaintiff carries the initial burden of proof of proposing a proper relevant market.  *United States v. Energy Sols., Inc.,* 265 F. Supp. 3d 415, 436 (D. Del. 2017) (citing *Penn State Hershey*, 838 F.3d at 338).  The proper relevant market for § 7 considerations is "determined by the reasonable interchangeability of use or the cross-elasticity between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  A larger market may be defined by submarkets, the boundaries of which may be determined "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Id.*  A submarket cannot be defined as a single product or in such an overly narrowly way to exclude similar competing products.  *See id.* at 326 ("[T]he boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies to recognize competition where, in fact, competition exists"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (explaining that a proposed relevant market was too narrow because it did not include "all reasonably interchangeable products").

Mr. Camaisa has failed to make allegations that plausibly construct a relevant market. The complaint states "[t]he relevant line of commerce and product market . . . is the market for cloud-based, bring-your-own-device ("BYOD") clinical trial software solutions for CROs." Complaint ¶ 9. This is fatally insufficient as it lacks the detail required to plausibly construct the outer boundaries of a relevant market. *Brown Shoe*, 370 U.S. at 326. Indeed, the relevant market proposed by Mr. Camaisa is inherently too narrow to "include all reasonably interchangeable products." *Queen City Pizza*, 124 F.3d at 438. The Complaint sets forth that Competitor ERT's product is a potential competing device for Parallel 6's software, Complaint ¶ 13 (alleging "[o]ne of PRA's competitors, ERT, offered the most similar solution"), however, the Complaint, in a conclusory fashion, narrowly draws the relevant market as being "cloud-based, bring-your-own-device ("BYOD") clinical trial software solutions for CROs," which necessarily exclude ERT's product. *Id.* ¶ 9.

Further, Mr. Camaisa fails to state any allegations, which address the several factors enumerated in *Brown,* that would allow the court to conclude that the market for Parallel 6's product is a narrower subset of the larger clinical trial software solutions market. *See generally* Complaint. At most, the Complaint's allegations address only one factor from *Brown*, "the product's peculiar characteristics." 370 U.S. at 325. Specifically, the Complaint alleges that "[a]lthough ERT's solution was similar to Parallel 6's technology, it relied on devices specifically designed to run its software," whereas Parallel 6's software allowed for BYOD capabilities. Complaint ¶ 13. Mr. Camaisa also contends that Parallel 6's software is a "unique, one-of-a-kind solution." Opposition to Motion to Dismiss at 17. However, considering the large factual gaps in the Complaint, the allegation that the relevant market is only limited to "cloud-based, bring-your-own-device ("BYOD") clinical trial software for CROs," is an unsupported legal conclusion. Complaint ¶ 9. The mere fact that Parallel 6's technology is one of a kind does not alone mean "reasonably interchangeable products" are not available to consumers. *See Queen City Pizza*, 124 F.3d at 437 (explaining that "[i]nterchangeability

implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively"). Therefore, even if there may be some technical differences between Parallel 6's product and ERT's product, Mr. Camaisa's Complaint draws the relevant market too narrowly. Because Mr. Camaisa has failed to propose a proper relevant market, he has failed to adequately to state a claim under § 7 of the Clayton Act and § 2 of the Sherman Act.

### 2. Mr. Camaisa Has Failed to Adequately Plead that the Merger Agreement Had an Anticompetitive Effect

PRA contends that Mr. Camaisa has failed to adequately plead that the Merger Agreement had an anticompetitive effect. Motion to Dismiss at 17–18. Specifically, PRA argues that Mr. Camaisa has failed to "make allegations about market concentration, PRA's market share, market power, or the effect of any alleged market power," which are necessary to assess anticompetitive effect. *Id.* at 18. Mr. Camaisa contends that he has adequately plead an anticompetitive effect and that PRA's argument is meritless as it fails to look at the "Complaint as a whole," "ignoring supporting allegations." Opposition to Motion to Dismiss at 18–19. The court agrees with PRA.

The burden of proof to establish a prima facie case is upon the plaintiff to demonstrate a probable lessening of competition. *A.G. Spalding & Bros. v. FTC*, 301 F.2d 585, 625 (3d Cir. 1962). To satisfy the second element, a plaintiff must show that the effect of the merger in that market is likely to be anticompetitive, which has been interpreted to include "[m]ergers with a probable anticompetitive effect" as opposed to strictly clear evidence of such effects. *Brown Shoe Co.*, 370 U.S. at 323. Accordingly, a court must consider "the interdependence of the market share foreclosed by, and the economic purpose of" the merger along with "the share of the market foreclosed." *Id.* at 328–29. The traditional method of demonstrating this is by showing a merger would "produce a firm controlling an undue percentage of the relevant market" and would "result[] in a significant increase

14

in the concentration of firms in that market." *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *Penn State Hershey*, 838 F.3d at 346.

Mr. Camaisa has failed to adequately plead that the Merger Agreement had an anticompetitive effect. Specifically, Mr. Camaisa alleges that "[a] CRO that acquired Parallel 6's technology . . . would be positioned to steal market share from its CRO competitors, who would have no access to comparable products." Complaint ¶ 14. Mr. Camaisa has failed to allege any such facts in his complaint. *See generally* Complaint. He has not provided any information about alterations in the market share following the merger, increased concentration of firms in the relevant market, elimination of competitors, or increased barriers to entry following the merger. *See Penn State Hershey*, 838 F.3d at 346 (finding that the Government's showing that the increase in market shares, market concentration, and percent of market controlled post-merger were clear indications that a merger had anticompetitive effects in the relevant market). Instead, Mr. Camaisa alleges in a conclusory fashion that the acquisition of Parallel 6 by PRA has anticompetitive effects. Complaint ¶ 33 (alleging that the merger has the effect of "lessening and harming competition" within the market). In the absence of any specific factual allegations, the court cannot accept as true Mr. Camaisa's conclusions and therefore finds that he has not sufficiently alleged anticompetitive effects.

### 3.   Mr. Camaisa Has Not Sufficiently Pleaded a Claim for Attempted Monopolization

PRA contends that "Mr. Camaisa has not sufficiently pleaded a claim for attempted monopolization" as required under § 2 of the Sherman Act. Motion to Dismiss at 18. Specifically, PRA argues that Mr. Camaisa failed to allege that PRA's "conduct was undertaken with a specific intent to monopolize" or that PRA has "a dangerous probability of achieving monopoly power." *Id.* at 18–19. Mr. Camaisa contends that he has adequately pleaded a claim for attempted monopolization. Opposition to Motion to Dismiss at 19–20. Specifically, Mr. Camaisa argues that he has satisfied the first two pleading requirements by alleging that "PRA recognized at the time of

15

the merger that a CRO leveraging Parallel 6's technology would be positioned to steal market share from its competitors, who would have no access to comparable products." *Id.* at 20 (citing Complaint ¶ 14). Mr. Camaisa also argues that he has satisfied the third pleading requirement by alleging "that PRA . . . has a dangerous probability of achieving monopoly power within the cloud-based BYOD clinical trial software solution market." *Id.* at 20–21. The court agrees with PRA.

The Sherman Act § 2 prohibits "monopoliz[ation] [of] any part of the trade or commerce among the several States, or with foreign nation." 15 U.S.C. § 2. To establish a prima facie case of attempted monopolization under § 2, the plaintiff must plead "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

To allege predatory or anticompetitive conduct, the Third Circuit has held that there are many types of conduct that can be considered anticompetitive and has set forth such examples that include: predatory pricing, denial of access to essential goods or services to competitors, arbitrary refusals to deal, and unfair tortious conduct. *LePage's Inc. v. 3M*, 324 F.3d 141, 152–53 (3d Cir. 2003). To determine if conduct is predatory or anticompetitive, "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *Id.* at 162. "Allegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition." *Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332, 342 (3d Cir. 2018).

Here, Mr. Camaisa has not alleged any specific actions taken by PRA that would be considered anticompetitive. Mr. Camaisa's assertion that PRA's acquisition of Parallel 6 would deplete the market of comparable products is undercut by his acknowledgement of competitors, such as ERT, who had similar products that merely lacked the BYOD capabilities of Parallel 6's technology. *See* Complaint ¶¶ 12–13. Mr. Camaisa has not asserted any other facts, such as predatory pricing or refusals to deal with other CROs, that would constitute anticompetitive actions and

16

foreclosure of consumer choice in the market. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406–07 (3d Cir. 2016) (explaining that plaintiff's evidence that defendant's discounts based on volume of product sold was not enough to allege anticompetitive actions because consumers were not foreclosed from purchasing products from competitors through penalties or threats to cut off supply or lack of choice). In the absence of such a showing, the court cannot find that Mr. Camaisa has adequately pleaded that PRA has engaged in predatory or anticompetitive conduct.

To allege specific intent, "a plaintiff [needs] to point to specific, egregious conduct that evinced a predatory motivation and specific intent to monopolize." *Avaya Inc., RP v. Telecom Labs., Inc.*, 838 F.3d 354, 406 (3d Cir. 2016). Specific intent may be inferred from "evidence that business conduct is 'not related to any apparent efficiency.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39). Accordingly, "[l]iability turns . . . on whether valid business reasons can explain [the defendant's] actions." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

Here, Mr. Camaisa's allegations regarding PRA's alleged specific intent to monopolize stemming from their acquisition of Parallel 6, are conclusory and unsupported by any facts. *See* Complaint ¶ 20. Mr. Camaisa's assertions that PRA's conduct following the merger, specifically preventing Parallel 6 from selling products to competitors was done with the knowledge and intent to monopolize the CRO market, are insufficient to adequately plead specific intent. *See Howard Hess Dental Labs. Inc. v. Dentsply*, 602 F.3d 237, 257–58 (3d Cir. 2010) (holding that allegations of defendant's understanding of the intended effect of restraining trade was insufficient to plead specific intent, because the conclusion was not factually supported and did not contain enough information to even infer an effort to squash competitors' business dealings). Moreover, Mr. Camaisa also fails to allege that PRA's motive in acquiring Parallel 6 was done for anything other than legitimate business purposes. *See Phila. Taxi*, 886 F.3d at 341 (finding that defendant's choice in driver hiring practices

could reasonably be viewed as "predominantly motivated by legitimate business aims," and therefore, did not support an allegation of specific intent to monopolize). The court finds that Mr. Camaisa has not adequately pleaded that PRA had a specific intent to monopolize the market.

To allege a dangerous probability of monopolization, a plaintiff should plead "factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand[.]" *Broadcom Corp.*, 501 F.3d at 318 (internal citation omitted); *see id.* (noting that market share is not an exclusive factor). With regards to entry barriers, a plaintiff ought to allege "regulatory requirements, high capital costs, or technological obstacles[] that prevent new competition from entering a market." *Phila. Taxi*, 886 F.3d at 342 (quoting *Broadcom Corp.*, 501 F.3d at 307). The Third Circuit "[a]cknowledg[ed] *Braodcom*'s reticence to resolve the dangerous probability question at the pleadings stage" but also explained that determining the dangerous probability question is nonetheless appropriate where no facts are alleged to support the relevant factors. *Phila. Taxi*, 886 F.3d at 342.

Here, the court may determine the dangerous probability question on the face of the pleadings because Mr. Camaisa failed to plead any factors necessary to adequately allege a dangerous probability of PRA achieving monopoly power. Indeed, Mr. Camaisa's Opposition neglects to cite as to where in the Complaint such allegations are pleaded. *See* Opposition to Motion to Dismiss at 20–21. Instead, Mr. Camaisa contends that the court may infer the factors of dangerous probability of monopolization. *See id.* Even though "proof of one element may provide 'permissible inferences' of other elements,'" dangerous probability of monopolization cannot be inferred where facts supporting none of the individual elements are alleged. *Phila. Taxi*, 886 F.3d at 362 (quoting *Broadcom Inc.*, 501 F.3d at 318). The case at hand is analogous to *Phila. Taxi* and inferring relevant elements based on proof of other elements is not possible where no factual allegations are made to

support any of the elements.  Specifically, the Supreme Court has explained that the court may not

infer dangerous probability here.  For example, the third element may not be inferred solely from the

complained of acts, rather, "demonstrating a dangerous probability of monopolization" "requires

inquiry into the relevant product and geographic market and the defendant's economic power in that

market." *Spectrum Sports*, 506 U.S. at 459.  Mr. Camaisa points to nowhere in the Complaint that

such relevant factors are pleaded to engage in the inquiry demanded by the Supreme Court.  As there

are inadequate alleged facts to find a dangerous probability of PRA monopolizing the market, Mr.

Camaisa has not adequately pleaded a claim for attempted monopolization under the Sherman Act.

## C.    Granting Mr. Camaisa Leave to Amend Is Futile

Rule 15(a) governs amendments to pleadings.  Leave to amend is generally given freely, as

the rule directs, however, when a proposed amendment would be futile, leave should be denied.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  Efforts to amend are futile when the claim as amended

would itself be futile because it would fail to state a basis for relief.  *In re Burlington Coat Factory

Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *see, e.g.*, *Andela v. Am. Ass'n for Cancer Res.*, 389

F. App'x. 137, 142 (3d Cir. 2010) (affirming the dismissal of claims with prejudice, because

plaintiff's pleadings and motions failed to indicate that he could provide factual support for Sherman

Act claims).  The decision to grant or deny leave to amend lies within the discretion of the court. *See

Foman*, 371 U.S. at 182.[3]

---

[3]    Granting Mr. Camaisa leave to amend is futile, because he can neither establish antitrust
standing nor can he assert allegations to plead a claim of attempted monopolization.  Indeed, at oral
argument despite inquiry from the court, Mr. Camaisa's Counsel offered no explanation of how he
could cure Mr. Camaisa's antitrust standing.  Moreover, he offered no persuasive argument that he
could amend the Complaint to cure the deficient relevant market definition without contradicting
allegations that competition exists in the market, which includes competitors with the ability to
acquire competing technologies.  Mr. Camaisa's Counsel admitted that the allegations made in
paragraphs 13, 37, 38, and 45 of the Complaint, are all true.  These paragraphs directly address the
competition within the market and the ability of PRA's competitors to acquire competing
technologies.  Mr. Camaisa's attorney stated they would not withdraw these paragraphs in the event
they amended the Complaint.  Accordingly, the court does not find it permissible to allow Mr.
Camaisa leave to amend the Complaint to assert contradictory allegations about the relevant market.

First, Mr. Camaisa cannot allege facts to show that he and the Shareholders have suffered an antitrust injury. Mr. Camaisa has conceded that he is neither a competitor nor a consumer in the market. *See id.* ¶ 5 ("Defendant acquired Parallel 6"); ¶ 4 ("[Mr. Camaisa] files this action with the authority of and in the interest of the holders of common stock, stock options, and stock appreciation rights of Parallel 6."). Moreover, as explained above, Mr. Camaisa and the Shareholder's alleged injury of not receiving the $10 million Contingent Consideration is not "inextricably intertwined" to PRA's alleged antitrust conduct because the alleged injury flows from an alleged breach of contract, not an antitrust violation. Additionally, Mr. Camaisa and the Shareholder's injury is not a typical antitrust injury, such as increased prices or being forced out of the market. *See McCullough*, 382 F. App'x at 231 (affirming the district court's decision to dismiss plaintiff's antitrust claims with prejudice when plaintiff failed to sufficiently allege an antitrust injury). Accordingly, granting leave to amend would be futile because the alleged injury is neither an antitrust injury nor causally connected to alleged anticompetitive conduct. *See Merck & Co. v. Apotex, Inc.*, 488 F. Supp. 2d 418, 430 (D. Del. 2007) (finding that leave to amend would be futile when plaintiff failed to establish antitrust injury and causal connection between defendant's actions and plaintiff's harm). As there are no facts that would allow Mr. Camaisa to establish antitrust standing, this alone is sufficient to dismiss his antitrust claims with prejudice.

Second, Mr. Camaisa cannot state a monopolization claim by amending the Complaint because Mr. Camaisa has implicitly conceded that competition exists in the market, which includes competitors with the ability to acquire competing technologies, thus, foreclosing a dangerous probability of PRA achieving a monopoly. *See* Complaint ¶ 45 ("Defendant's competitors . . . have swiftly moved to acquire the companies producing these new products[,] . . . CROs have begun merging to further consolidate access to these software solutions"); *Id.* ¶ 38 ("[Because of] spiked growth in decentralized clinical trials . . . CROs are now acquiring other CROs for access to clinical

trial software"); *Id.* ¶ 37 ("Emerging companies offering similar clinical trial platforms have been swiftly acquired by CROs that compete with PRA"). As Mr. Camaisa cannot show that competition within the market has been harmed by PRA's alleged antitrust actions, based on the aforementioned concessions, any amendment to his complaint would be futile. *See Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 413 n.6 (3d Cir. 1997) ("[I]njuries to an individual competitor company, without allegations of injury to competition or consumer welfare, are insufficient as a matter of law to establish a violation of federal antitrust law.") (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, No. 95-4885, 1996 WL 284994, at *3 (E.D. Pa. May 21, 1996)). Accordingly, Mr. Camaisa's claims are dismissed with prejudice.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, and given his admissions regarding competition, Mr. Camaisa's claims are dismissed with prejudice.

**IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss is Granted; and

2. The Parties are Ordered to File a Joint Proposed Judgment within Seven (7) Days of this Order.